IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CHRISTAL H., Plaintiff, | ) | |
| v. | ) | 1:25CV727 |
| FRANK BISIGNANO, Commissioner of Social Security, Defendant. | ) | |

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Christal H. ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on December 19, 2022, alleging a disability onset date of October 28, 2022 in both applications. (Tr. at 43, 251-62.)[1] Her applications were denied initially (Tr. at 92-115, 138-43) and upon reconsideration (Tr. at 116-37, 162-69). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 170-71.) On May 9, 2024, Plaintiff, along with her

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #4].

attorney, attended the subsequent hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 43, 71-91.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 58), and, on June 9, 2025, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review (Tr. at 1-7).

## II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

## III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since October 28, 2022, her alleged onset date. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 46.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> osteoarthritis; rheumatoid arthritis; degenerative disc disease; asthma/chronic obstructive pulmonary disorder (COPD); bilateral carpal tunnel syndrome; and adjustment disorder with depressed mood[.]

(Tr. at 46.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 46-48.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform light work, but with the following, non-exertional limitations:

> [Plaintiff] can occasionally climb, stoop, kneel, crouch and crawl; [she] can frequently, but not constantly, reach overhead bilaterally; she can frequently, but not constantly, finger bilaterally; [Plaintiff] must avoid concentrated exposure to fumes, odors, dust and gases; she can have occasional interaction with co-workers and the public; and [she] retains the capacity to do simple, routine and repetitive tasks.

(Tr. at 49.) At step four of the analysis, the ALJ determined, based on the testimony of the vocational expert, that all of Plaintiff's past relevant work exceeded the above RFC. (Tr. at 56.) However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled under the Act. (Tr. at 57-58.)

Plaintiff now contends that the ALJ "erred by failing to apply the correct legal standards when evaluating [Plaintiff's] allegations of pain." (Pl.'s Br. [Doc. #10] at 1, 5.) Specifically, Plaintiff argues that the ALJ failed to properly examine the extent to which pain limits Plaintiff's ability to use her hands. As set out above, the ALJ found at step two of the sequential analysis that Plaintiff's osteoarthritis, rheumatoid arthritis, bilateral carpal tunnel syndrome, and degenerative disc disease of the cervical spine all constituted severe impairments. (Tr. at 46.) In making this finding, the ALJ acknowledged that all of these impairments impact Plaintiff's ability to perform basic work activities, particularly with her upper extremities. Nevertheless, the ALJ found that Plaintiff remained capable of light work, frequent overhead reaching, and frequent fingering, with "frequent" defined as occurring up to 2/3 of an 8-hour workday. (Tr. at 46.)

Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304 (Oct.

25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 404.1529. Moreover, in Arakas v. Comm'r of Soc. Sec., 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit clarified the procedure an ALJ must follow when assessing a claimant's statements, including pain:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

983 F.3d at 95–96. Thus, the second part of the test requires the ALJ to consider all available evidence, including Plaintiff's statements about her pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [her] ability to work." Craig, 76 F.3d at 595. This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit her ability to perform basic work activities. Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings," Craig, 76 F.3d at 595, as well as the following factors set out in 20 C.F.R. § 416.929(c)(3) and 20 C.F.R. § 404.1529:

> (i) [Plaintiff's] daily activities;
> (ii) The location, duration, frequency, and intensity of [plaintiff's] pain or other symptoms;

(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [her] pain or other symptoms;
(v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [her] pain or other symptoms;
(vi) Any measures [Plaintiff] use[s] or [has] used to relieve [her] pain or other symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

In the present case, as recounted in the ALJ's decision, Plaintiff testified as follows regarding her upper extremity symptoms:

> [Plaintiff] stated that she has nerve issues in her hands. Her hands swell and are irritated, and her wrists are bad. [Plaintiff] drops things, and she has issues with buttons, zippers and snaps. She sometimes has trouble with doorknobs. When asked to define the word "sometimes," [Plaintiff] stated that she has the problems 20 days per month. She does not tie her shoes and wears flipflops all of the time. Her daughter opens jars and water bottles for her. . . . When asked how much weight she can lift, [Plaintiff] replied that she does not know, but that she cannot lift a 2-gallon jug of milk. . . . [Plaintiff also] reported fibromyalgia pain in her shoulders, arms and arm muscles. She gets those pains once a week[.] She cannot concentrate due to pain, and [her] medications interrupt her sleep patterns and cause heart palpitations.

(Tr. at 50; <u>see also</u> Tr. at 76-82.) Although the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms," he ultimately concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. at 50.) In particular, the ALJ found that Plaintiff could perform "a broad range of unskilled light work because the record shows intact physical . . . functioning despite [her impairments]." (Tr. at

50.) Plaintiff now highlights this statement in arguing that "the ALJ determined that the *objective* evidence of record did not fully substantiate [Plaintiff's] alleged pain." (Pl.'s Br. at 8.)

Plaintiff correctly notes that she "suffers with several conditions impacting her ability to use her hands, including [rheumatoid arthritis] which causes swelling and pain, cervical radiculopathy, and carpal tunnel syndrome," and that she "has consistently sought treatment for the discomfort she experiences in her hands." (Pl.'s Br. at 8.) Plaintiff further notes that, upon examination, "she has consistently exhibited swelling in her joints" along with "reduced motor strength and signs of radiculopathy." (Id.) Nevertheless, the ALJ repeatedly "offset [Plaintiff's] complaints of pain and the obvious swelling in her finger joint by [citing] otherwise 'benign' *objective* examinations." (Pl.'s Br. at 8-9.) For example, the ALJ cited to multiple records for the finding that "range of motion and strength were normal" prior to the alleged onset date, but these records also consistently noted that Plaintiff's blood tests were positive for rheumatoid arthritis with joint swelling and bony enlargement in her fingers and with joint stiffness and painful joints. For example:

- On December 17, 2021, Plaintiff was seen by rheumatology "for evaluation of a two and a half year history of multi-joint pain and swelling." (Tr. at 50.) The ALJ noted that "[h]er range of motion and strength were normal." (Tr. at 50.) However, that record also reflects that her blood test was positive for RF and inflammatory markers, that she had joint stiffness and painful joints, and that on examination her hands showed right third PIP joint swelling and bony enlargement and left 2nd and 3rd MCP joint swelling. (Tr. at 555-56.) As acknowledged by the ALJ, the rheumatologist "diagnosed polyarthalgia, multisite rheumatoid arthritis, other fatigue and bilateral hand swelling" and "prescribed methotrexate and folic acid." (Tr. at 50.)[4]

---

[4] The ALJ dated this visit as December 7, 2021, but the record he cites is for December 17, 2021. (Tr. at 555.) The ALJ then again discussed the same visit, noting that on December 17, 2021, Plaintiff presented "for evaluation of an elevated sedimentary rate and joint pain." (Tr. at 50.) The ALJ found that "[o]bjective findings

- On January 28, 2022, at a visit with her primary care provider, Plaintiff "endorsed multi-joint discomfort with redness, swelling, stiffness and joint deformity." (Tr. at 50.) The ALJ did not address that visit further. That record reflects that Plaintiff presented with "join pain, joint redness, joint swelling, joint stiffness, joint deformity and morning stiffness" in multiple joints including "right proximal interphalangeal joint" and that she was followed by rheumatology and recently started methotrexate. (Tr. at 481.) On examination, she had "Bouchard's nodes evident to 3rd and 5th digits" and tenderness over the DIP joint and synovial swelling in the 3rd digit of her right hand. (Tr. at 482.)

- On May 25, 2022, Plaintiff had another visit with her rheumatologist and "reported diffuse joint pain and stiffness, as well as low back and neck pain." The ALJ found that "[o]bjective exam findings were benign despite this," and "joint ranges of motion and strengths were normal." (Tr. at 51.) However, this record reflects that Plaintiff had "[p]ositive RF and elevated inflammatory markers consistent with RA" with persistent joint pain and stiffness, and on examination "right 3rd PIP synovitis and bony enlargement" and "left 2-3rd MCP swelling." (Tr. at 558.) She was continued on methotrexate and started on prednisone "for her acute flare." (Tr. at 559-60.)

- On July 28, 2022, Plaintiff returned to her rheumatologist, although this visit is not addressed in the ALJ's decision. (Tr. at 562.) This record reflects that she "continues to [h]ave joint pain in her hands" with joint pain and stiffness, and examination reflected "right 3rd PIP synovitis and bony enlargement" and "left 2-3rd MCP swelling." (Tr. at 562-63.) Her blood tests reflected elevated sedimentation rate with "inflammatory markers", she had "persistent RA activity", and she was continued on methotrexate and given a Humira pen to give herself injections of depomedrol for acute symptoms. (Tr. at 563-64.)

- On August 3, 2022, Plaintiff again presented to her primary care provider "with moderate multi-joint pain." At that time, "[s]ymptom control was fair." (Tr. at 51.) Notably, the ALJ found that "[a] broad light residual functional capacity is warranted despite this because the examiner noted that [Plaintiff] could do activities of daily living with limitations and she could work with limitations." (Tr. at 51.) In making this finding, the ALJ discounted the opinion of the same provider, NP Sarah Routh, who

---

were benign overall" and "range of motion and strength were normal." (Tr. at 50) However, as noted above, the record also reflects that her blood test was positive for RF and inflammatory markers, that she had joint stiffness and painful joints, and that on examination her hands showed right third PIP joint swelling and bony enlargement and left 2nd and 3rd MCP joint swelling. (Tr. at 555-56.) It is possible that the ALJ intended to refer to a December 3, 2021 treatment record with Plaintiff's primary care provider, which reflects that she presented with joint pain, joint redness, joint swelling, joint stiffness, joint deformity, and morning stiffness in multiple joints including right proximal interphalangeal joint, and had a rheumatology appointment scheduled for December 17. (Tr. at 484-85.)

submitted a medical source statement on Plaintiff's behalf the same day. In this opinion, NP Routh opined that Plaintiff could not lift more than 10 pounds. The ALJ not only found that Ms. Routh's opinion was "not supported by her own notes," but also that the opinion was "not entirely consistent with other evidence which shows intact physical functioning." (Tr. at 52.) The ALJ's reasoning is not clear regarding this treatment record. The record reflects that Plaintiff saw her regular provider, NP Routh, for "joint pain, joint redness, joint swelling, joint stiffness, joint deformity and morning stiffness," and NP Routh completed FMLA paperwork for her, noting that Plaintiff "is currently able to do activities of daily living with limitations and able to work with limitations" specifically with "work restrictions as she is no longer able to lift and perform duties related to heavy lifting >10 lbs due to the progression of her RA." (Tr. at 453, 506.) It is not clear how that opinion is internally inconsistent.

After her alleged onset date in October 2022, the treatment records are similar, although the ALJ considered some of these records in much less detail:

- On November 1, 2022, Plaintiff had an appointment with her rheumatologist, and the ALJ noted "Humira failure with active joint synovitis" with a changed prescription from Humira to Orencia. (Tr. at 52.) "At the same time she was continuing on methotrexate and was tolerating it well." (Tr. at 52.) Although not further addressed in the ALJ's decision, this treatment record reflects that she "continues to [h]ave joint pain in her hands" with joint pain and stiffness and examination again reflecting "right 3rd PIP synovitis and bony enlargement" and "left 2-3rd MCP swelling." (Tr. at 566-67.) Blood tests again reflected an elevated sedimentation rate, and she was prescribed depomedrol shots for her "acute flare." (Tr. at 567-68.) Her rheumatologist ordered an ultrasound of her hands, which confirmed joint synovitis in her left MCP joints. (Tr. at 568-69, 575.)

- On November 7, 2022, Plaintiff presented to Wake Forest Thomasville Medical Center "as tearful with worsening muscle pains and aches." (Tr. at 52.) That record reflects that Plaintiff "left after 8hrs in the waiting room." (Tr. at 593.) The ALJ noted that "[o]bjective findings at an exam done 8 days later were unremarkable." (Tr. at 52.) This appears to be a reference to a November 14, 2022 treatment record with a new primary care practice, although that record reflects "stiffness with range of motion" in her upper extremities, and that she was "very tearful today during the encounter." (Tr. at 590.)

- On March 25, 2023, Plaintiff was seen in the Randolph Hospital emergency department "for treatment of body aches and joint aches, including pain in the bilateral elbows and shoulders." (Tr. at 52.) The ALJ found that the providers noted equal strength in all extremities, no clubbing or edema in the extremities, no palpable deformities, no erythema or warmth of any large joint, and no obvious joint effusions.

(Tr. at 52.) That record reflects that Plaintiff had lost her insurance and had been without her rheumatoid arthritis medication since November. (Tr. at 672.) She was prescribed oxycodone and prednisone. (Tr. at 674.)

- On April 22, 2023, consultative examiner Emerald Picarra, a nurse practitioner, found that Plaintiff "could lift carry and handle light objects." (Tr. at 52, 53, 655.) The ALJ concluded that Plaintiff "can do a broad range of unskilled light work because exam findings were mostly benign." (Tr. at 53) However, the consultative examination reflects that, upon examination, Plaintiff's bilateral wrist flexion and extension were 3/5 and her hand grip was 4/5 bilaterally. (Tr. at 53, 654.) The consultative examiner opined that Plaintiff would have moderate limitations in feeling with her hands and mild limitations in grasping, but the ALJ found the opinion unpersuasive. (Tr. at 54, 659.)

- On May 2, 2023, Plaintiff returned to Randolph Hospital, "reporting numerous pain complaints." The ALJ found that "[a] broad light [RFC] is appropriate despite [Plaintiff's] complaints because lab findings were mild, and changes in inflammatory marker changes were otherwise stable." (Tr. at 54.) However, the record reflects that Plaintiff reported pain in her arm and hand (Tr. at 668), and the examination reflected "[s]equelae chronic inflammatory arthritis in the hands." (Tr. at 669.) The labs reflected inflammatory markers and she was diagnosed with a "Rheumatoid arthritis flare." (Tr. at 669.) She was prescribed oxycodone and prednisone. (Tr. at 670.)

- On June 12, 2023, Plaintiff presented to Merce Clinic to establish care. The ALJ acknowledged that she continued to report chronic pain, and "[t]he examiner noted swelling at the finger joints on evaluation." (Tr. at 54.) The ALJ nevertheless concluded that "other findings were good." (Tr. at 54.) Plaintiff was referred to rheumatology, and the ALJ noted that on June 22, 2023, "[r]heumatologists at Atrium healthcare diagnosed psoriatic arthritis and unspecified type osteoarthritis." (Tr. at 54.) However, Plaintiff continued to have difficulty obtaining care due to a lack of insurance.

- On October 9, 2023, Plaintiff presented to Kintegra Health "with pain in her left foot, right arm, right hand and her neck." (Tr. at 54.) Notably, she reported that "[s]he could not use here left hand anymore. Her left fourth finger was so tender she could barely touch it" due to a "reported rheumatoid arthritis flare [that] had been going on for a month" and for which "medications were ineffective." (Tr. at 54.) The ALJ characterized Plaintiff's "[o]bjective exam findings [as] generally good despite [her] complaints." (Tr. at 54.) However, the treatment record reflects that on examination, Plaintiff's finger joints were swollen and tender, she could not bend her left fourth finger, and she had pain with minimal palpation. (Tr. at 864.) The ALJ acknowledged

this examination, and it is unclear how that examination supports the conclusion that "objective exam findings" were "generally good despite [her] complaints." (Tr. at 54.)

- On February 8, 2024, Plaintiff had obtained insurance and presented to Atrium rheumatology for a new patient consultation regarding her psoriatic arthritis. The ALJ noted that "[s]he endorsed pain and edema in her finger joins, wrists, knees, and SI joints," and the providers "diagnosed uncontrolled inflammatory arthritis," but that Plaintiff's "motor functions were intact and sensation was intact." (Tr. at 54-55.) That treatment record reflects that on examination, Plaintiff had tenderness and swelling in her MCP and PIP joints in both hands. (Tr. at 800.) A detailed, joint-by-joint "homunculus joint exam" reflected both tenderness and swelling in her right MCP 2, 3, 4, 5, left MCP 2, 3, 4, 5, and right PIP 2, 3, 4, 5, and tenderness in her left PIP 2, 3, 4, 5. (Tr. at 810-11, 832.) Her blood test was positive for rheumatoid factor and for CCP antibodies. (Tr. at 840, 742-43.)

- At an acute visit with a nurse practitioner on March 19, 2024, Plaintiff's "fingers were painful" and she "endorsed arthralgias and joint swelling." (Tr. at 55.) "Examiners noted finger joint nodules" as well as "[g]eneral tenderness," but the ALJ found that "there was no swelling, deformity, or signs of injury" and that "ranges of motion were normal," and again noted that "[o]bjective exam findings were generally good." (Tr. at 55.) However, this treatment record reflects that Plaintiff presented with "[f]inger joints with nodules and fingers starting to deform, tender and stiff." (Tr. at 908.)

- Three weeks later, Plaintiff "presented to Atrium Orthopedics on April 10, 2024 with complaints of bilateral hand pain and weakness." (Tr. at 55.) At that visit, which took place less than a month before her administrative hearing:

  > [Plaintiff] reported severe pain, as well as intermittent swelling of the bilateral MCP joints. [She] endorsed hand weakness and indicated that she had been dropping things. The specialists noted right hand edema across the MCP joints, but no erythema or ecchymosis. There was no thenar, hypothenar or intrinsic atrophy, and sensation was intact to light touch in the superficial, radial, median and ulnar distributions. Tinel, Durkin and Phalen signs were positive, but wrist flexion, extension, pronation and supination were full, and cubital tunnel tests were negative. An electrodiagnostic test done on April 24, 2024 showed evidence of bilateral C5-C6 radiculopathies. The scan did not pick specific peripheral nerve entrapment in the upper extremities. [Plaintiff] reported two days later that she had started to develop significant neck discomfort with referred pain into the upper extremities, and numbness of the upper extremity [sic] with activity. Increased activity seems to exacerbate her symptoms, and [Plaintiff] endorsed nocturnal dyesthesias. Objective exam findings showed intact function despite [Plaintiff's]

> complaints. Bilateral upper extremity strengths were 5/5, sensation was normal to light touch, and a Tinel sign was negative.

(Tr. at 55.) However, that treatment record for April 10, 2024 reflects reduced strength of 4/5 in her right fingers, in addition to the swelling of the MCP joints in her right hand. (Tr. at 917.) That record also reflects "ulnar drift of the digits" in her left hand, along with the swelling of the MCP joints in her left hand. (Tr. at 917.) Thus, objective findings showed weakness, deformity, and swelling in her fingers. (Tr. at 917.) In addition, the treatment record for April 26, 2024, reflects a diagnosis of "Bilateral hand pain" and "Weakness of both hands." (Tr. at 922.)

The above analysis clearly supports Plaintiff's contention that the ALJ "time and time again" cited "objective exam findings", specifically normal strength, range of motion, and sensation, to discount Plaintiff's degree of bilateral hand pain and the effect of that pain on her functional abilities. (Pl.'s Br. at 8-9.) This is concerning for at least two reasons. First, as set out in the above summary, the ALJ's findings of "normal" exam findings often mischaracterizes the treatment notes, which repeatedly reflected swelling, weakness, tenderness, and deformity of the fingers on examination, with blood tests confirming rheumatoid arthritis with inflammatory markers. Second, the reliance on normal strength, range of motion, and sensation fails to take into account Plaintiff's complaints of stiffness and pain, which are also supported by the treatment records.

The only other evidence supporting the ALJ's finding that Plaintiff could perform "frequent" fingering comes in the form of the State agency medical consultant's opinions. (See Tr. at 56.) As noted by the ALJ, the consultants issued assessments at the initial and reconsideration levels on May 4, 2023 and October 9, 2023, respectively, in which they opined, in pertinent part, that Plaintiff "could do frequent, but not constant, fine manipulation due to

decreased strength in wrist extension and hand grip." (Tr. at 56; see also Tr. at 100-01, 122-23.) In finding the State agency opinions "generally persuasive," the ALJ explained as follows:

> They supported their conclusions with multiple citations to the record, and a broad light [RFC] is consistent with evidence which shows intact physical ability with some limitations. Findings on April 22, 2023 are typical. [Plaintiff] could lift, carry and handle light objects, hand-eye coordination was good, there were no balance problems, tandem walk was normal and her gait pattern was normal and reciprocal. Extremity strength on March 25, 2023 was equal. [Plaintiff] also reported on July 12, 2022 that Gabapentin and Amitriptyline helped alleviate her pain.

(Tr. at 56) (internal citations omitted). The ALJ nevertheless explained that he did "not directly adapt the consultants' findings because they did not examine [Plaintiff], and they did not have access to the complete record." (Tr. at 56.) Despite acknowledging that the consultants did not have the opportunity to review more recent medical evidence, the ALJ does not appear to have considered whether Plaintiff's required greater limitations in handling and fingering, particularly in light of her dramatically increased symptoms over the course of the relevant period, with significant findings on and after the consultants' review in October 2023. As set out at length above and in the ALJ's decision, Plaintiff's providers found that she suffered from "uncontrolled inflammatory arthritis" during this time, which correlates with Plaintiff's testimony of heightened symptoms at the time of her May 2024 hearing. The findings of swelling, extreme tenderness, weakness, and deformity in her hands and fingers due to arthritis flares during this period belie the ALJ's conclusion that Plaintiff's pain and other hand-related symptoms were well controlled with medication.

Defendant fails to address any of the above issues directly. Instead, he more generally argues that the ALJ "credited complaints and accounted for resulting limitations based on a holistic review of the evidence," and was entitled to do so. (Def.'s Br. [Doc. #11, 12] at 5.)

Defendant further contends that "Plaintiff seems to read Arakas as requiring this Court to remand an ALJ's decision categorically where there is a pain related impairment and the ALJ does not accept a claimant's allegations of disabling limitations at face value." (Def.'s Br. at 5.) Defendant is mistaken. Plaintiff relies on Oakes v. Kijakazi, 70 F.4th 207, 215 (4th Cir. 2023), in which the Fourth Circuit held that "a claimant is entitled to rely exclusively on subjective evidence to prove the severity of their symptoms." Significantly, the Fourth Circuit remanded in Oakes because the ALJ "never addressed the fact that disability benefits can be awarded on the sole basis of an objective impairment and derivative subjective pain[.]" Oakes, 70 F.4th at 215-16. However, Oakes does not stand for the proposition that objective evidence has no role symptom analysis. Rather, it clarifies that an ALJ may not rely upon objective evidence alone to discount a claimant's symptoms. An ALJ could, for example, also cite a claimant's conservative treatment, symptomatic improvement when compliant with treatment, or her continuing ability to perform a wide variety of daily activities. Here, the ALJ points to little but objective evidence to undermine Plaintiff's pain complaints, and the little he does cite proves flawed, as set out above.

Notably, Defendant acknowledges that "'it is the ALJ's responsibility, not the Court's, to reconcile inconsistencies in the medical evidence.'" (Def.'s Br. at 5-6) (citing Michaels v. Colvin, 3:15-CV-388-RJC-DSC, 2016 WL 870975, at *8 (W.D.N.C. Mar. 25, 2016)) (internal citations and quotation marks omitted). In doing so, he highlights exactly why this case requires remand. Not only did the ALJ fail to apply the correct legal standard when assessing the effect of Plaintiff's pain, but in doing so, he also failed to consider copious evidence of increased pain and other symptoms later in the alleged disability period, and he

mischaracterized much of the treatment record. As Plaintiff correctly notes, the vocational expert in this case testified that a person who is limited to no more than occasional, rather than frequent, handling and fingering, could not perform any of the jobs cited by the ALJ at step five of the sequential analysis. (Pl.'s Br. at 6) (citing Tr. at 88-89). "Thus," Plaintiff argues, she "has described potentially disabling limitations to the Agency and in her sworn testimony." (Pl.'s Br. at 6.) Overall, the Court finds that the ALJ in this case failed "to assess [the] claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). Because it is the role of the ALJ, not the Court, to reconcile such evidence in the first instance, this matter requires additional proceedings at the administrative level.

IT IS THEREFORE ORDERED that the Commissioner's decision finding no disability is REVERSED, and that the matter is REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner is directed to remand the matter to the ALJ for further consideration of Plaintiff's claim. Defendant's Dispositive Brief [Doc. #11, 12] is DENIED, and Plaintiff's Dispositive Brief [Doc. #10] is GRANTED to the extent set out herein.

This, the 29th day of September, 2026.

Joi Elizabeth Peake
United States Magistrate Judge